**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee,*<br><br>v.<br><br>BRIANA WATERS,<br>*Defendant-Appellant.* | No. 08-30222<br><br>DC No.<br>CR 05-5828 FDB<br><br>ORDER AND<br>AMENDED<br>OPINION |

Appeal from the United States District Court
for the Western District of Washington
Franklin D. Burgess, District Judge, Presiding

Argued and Submitted
March 5, 2010—Seattle, Washington

Filed September 15, 2010
Amended December 6, 2010

Before: A. Wallace Tashima, Raymond C. Fisher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Tashima

19317

## COUNSEL

Dennis P. Riordan, San Francisco, California, for the defendant-appellant.

Michael S. Morgan, Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellee.

## ORDER

The opinion filed September 15, 2010, slip op.14097, and reported at 622 F.3d 1075, is amended by deleting the penultimate sentence in the third paragraph of the opinion, slip op. at 14103, 622 F.3d at 1078, which states: <<A jury convicted Waters of both counts of arson, but acquitted her of the remaining charges.>> and replacing it with: <<A jury convicted Waters of both counts of arson, but was deadlocked on the remaining charges.>>

With this amendment, the panel votes to deny the government's petition for panel rehearing. No further petitions for rehearing will be entertained.

## OPINION

TASHIMA, Circuit Judge:

In May 2001, several radical environmentalists decided to take a stand against genetic engineering. They did not protest; they distributed no literature. Instead, they opted for a more direct approach: they selected two targets that they (erroneously) believed were engaged in genetic engineering, and burnt them to the ground.

One of the targets was the office of Dr. Toby Bradshaw, a professor at the Center for Urban Horticulture at the University of Washington ("UW"). The fire, started with a homemade, timed incendiary device, spread from Professor Bradshaw's office to the rest of the building, damaging several rare books in the library and ultimately causing more than $6 million in damage.

An investigation into the fires led the government to believe that Briana Waters, the defendant before us, was involved. She was eventually indicted on two counts of arson, one count of conspiracy to commit arson, possession of an unregistered firearm, and use of a destructive device during a crime of violence. A jury convicted Waters of both counts of arson, but was deadlocked on the remaining charges. She was sentenced to six years' imprisonment.

Waters now appeals her conviction. Having reviewed the record of the proceedings below, we conclude that Waters' trial suffered from a number of errors. Because the government has not convinced us that Waters' verdict was unaffected by those errors, we reverse her conviction and remand for a new trial.

# I.

## A.

At the center of this case is a radical environmental organization known as the Earth Liberation Front ("ELF"). Both ELF and its companion organization, the Animal Liberation Front, are considered "domestic terrorist" groups by the FBI. The groups advocate using "economic sabotage" to undermine the "capitalist state," which they blame for the destruction and subordination of the environment. Although a central tenet of both groups is to "take all necessary precautions against harming any animal — human and nonhuman," the groups strive to inflict as much damage on economic targets as possible. In particular, the groups target those enterprises that they perceive to be "profiting off the destruction of the natural environment."

Fire has been ELF's weapon of choice, and the group has committed a number of high-profile arsons over the past 15 years. In 1998, for example, ELF claimed responsibility for an arson at Vail Ski Resort in Colorado. The fire damaged several chairlifts and destroyed a new mountaintop lodge, ultimately causing more than $12 million in damage. *See* Deborah Frazier, et al., *Arson Confirmed at Vail: Investigators Discover Plastic Jugs that Had Contained Gasoline, Take Casts of Shoe Prints*, Denver Rocky Mountain News, Oct. 23, 1998, at 7A, *available at* 1998 WLNR 828998. ELF's costliest arson to date, which caused more than $50 million in damages, burned a new, 206-unit apartment building in San Diego to the ground. *See* Pauline Repard, *Militants Say they Set $50 Million Condo Blaze: Earth Liberation Front Posts Claim on Web Site*, San Diego Union-Tribune, Sept. 9, 2003, at B1, *available at* 2003 WLNR 16778636. On a smaller scale, ELF members have repeatedly attacked "Mc-Mansions" and SUV dealerships. *See, e.g.*, Steve Miletich, *Hunt is on: Who Torched the Street of Dreams?*, Seattle Times, Mar. 4, 2008, at A1, *available at* 2008 WLNR

4342378; *State v. Luers*, 153 P.3d 688 (Or. Ct. App.), *modi-fied*, 160 P.3d 1013 (Or. Ct. App. 2007); *United States v. Cot-trell*, 333 F. App'x 213 (9th Cir. 2009). As the Seventh Circuit recently described when cataloging the breadth of ELF's destruction:

> [S]ince ELF's inception in 1987, its members have been responsible for bombings, arson, vandalism, and a host of other crimes. In fact, between 2000 and 2005, 43 of the 57 reported terrorist attacks committed on American soil were done by ELF members or their sister organization, the Animal Liberation Front. ELF's terror attacks have caused over fifty million dollars in damage to public and private property, including the arson of condominium complexes, multiple university research facilities, a ski resort, logging facilities, a high-voltage energy tower, and almost a score of other pieces of private property. A perfunctory survey of some of the cases involving ELF shows the breadth of its destructive force, including a conspiracy stretching over five states and involving nineteen separate acts of arson.

*United States v. Christianson*, 586 F.3d 532, 538 (7th Cir. 2009).

Like many similar organizations, ELF operates without a structured, central hierarchy; it has no formal leadership, membership, or official spokesperson. Instead, the organization uses an "anonymous cell structure." Individuals or cells independently plan their own actions, and use the name ELF to convey their common purpose.

**B.**

The arson at issue in this case started in the early morning hours of May 21, 2001. The same morning, another fire destroyed the Jefferson Poplar Farm, hundreds of miles away

in Clatskanie, Oregon. At the site of the Oregon fire, the
words "You cannot control what is wild" and "ELF" were
spray painted on one of the surviving buildings. A communi-
que from ELF later claimed responsibility for both fires.

The investigation into these fires saw little progress until
2004, when a man suspected of participating in the Oregon
arson agreed to cooperate. With the help of this witness, the
case broke wide open. The government came to believe that
the UW arson had been the work of five individuals, although
which five was a matter of some debate. Authorities were cer-
tain of the identities of three participants. Lacey Phillabaum
and Jennifer Kolar, both seasoned ELF members, admitted to
participating in the arson. William Rodgers, the man the gov-
ernment described as the head of the ELF cell that committed
many of the arsons across the West, was identified by both
Phillabaum and Kolar as a third member. Rodgers committed
suicide while in jail shortly after he was arrested.

The identities of the final two participants were less clear.
Kolar was the first to give a statement to the FBI, but her
memory was hazy. She named the participants as herself,
Rodgers, and three individuals whom she described as "Capi-
tol Hill Girl," Capitol Hill Girl's "punk boyfriend," and
"Crazy Dan." The agents ultimately learned the identities of
these individuals and determined that none of them had been
involved in the UW arson. A few weeks after making her ini-
tial statement, Kolar returned to the FBI and told them that
she had remembered Waters' involvement in the crime. Kolar
claimed that she had remembered Waters' involvement after
coming across Waters' name in her telephone's contact list.
Kolar never identified the remaining two arsonists, and never
named Phillabaum as a participant, despite the fact that the
two had a long acquaintanceship, including attending various
small meetings together where they discussed environmental
sabotage.

Two months after Kolar's proffer, Phillabaum met with the FBI. She confessed to her participation in the UW arson and told investigators that the remaining four participants were Rodgers, Kolar, Waters, and Waters' boyfriend, Justin Solondz. A search of Solondz's residence soon thereafter uncovered evidence that he had been involved in the arson. He fled the country before police could find him.[1]

Based on this information, a grand jury indicted Waters and Solondz, along with three individuals who had been involved in the Jefferson Poplar arson. Phillabaum and Kolar pled guilty to separate charges, and were sentenced to three and five years' imprisonment, respectively.

## C.

Phillabaum and Kolar were key witnesses in Waters' trial, both giving detailed accounts of Waters' role in the arson. Both agreed that Waters was not significantly involved with ELF and did not attend the initial meetings in which the UW and Jefferson Poplar arsons were planned. In May 2001, however, close to two weeks before the UW arson was to take place, Waters joined the plot to destroy the UW Center for Urban Horticulture. She attended a meeting at a Denny's restaurant in Olympia with Phillabaum, Solondz, Kolar, and Rodgers. The five held two other meetings shortly thereafter.

Kolar and Phillabaum also gave similar descriptions of the night the arson occurred. They both testified that the five arsonists met at the Greenlake Bar & Grill in Seattle on the night of May 20, 2001. After midnight, the group drove to the Center for Urban Horticulture on the UW campus. Waters

---

[1] Solondz was discovered in China in November 2009. He is currently serving a three-year term of imprisonment and will be extradited to the United States when that sentence is completed. *See* Dan Levin, *China Jails American Environmentalist Wanted by F.B.I. in Attacks*, N.Y. Times, Nov. 28, 2009, at A4, *available at* 2009 WLNR 24060348.

acted as a lookout, hiding in nearby bushes with a police scanner and walkie-talkie. The remaining four arsonists carried the incendiary devices to the Center for Urban Horticulture. Kolar cut into a window, after which Rodgers and Solondz climbed in and set the devices. The arsonists then returned to Waters, and they all drove away. Some time after 3 a.m., the incendiary devices ignited, starting a fire that would destroy the building.

The government was able to corroborate some of this testimony through another witness, Robert Corrina. For example, both Phillabaum and Kolar testified that Waters was in charge of obtaining a car that they would use for the arson. Waters told them that she would have a "distant, untraceable" relative rent a car for her. Corrina was that relative. He and Waters were cousins and, at the time of the UW arson, Waters was living in Corrina's basement in Olympia.

Corrina testified that on May 19, 2001, his wife rented a car at Waters' request. The next evening, Waters complained of abdominal pains. She and Solondz left in the rental car, purportedly to go to the hospital. Waters did not return until Monday, May 21. She told Corrina that they had been unable to find an emergency room in Olympia and had driven to Seattle. Records obtained from the car rental company indicated that the car was returned sometime before 6:30 a.m. on May 21. The records also indicated that the car had been driven 237 miles, a distance sufficient to cover a roundtrip between Olympia and Seattle.

Waters' defense was that she was being set up by Phillabaum and Kolar, both of whom she claimed held grudges against her. She offered little in the way of an alibi and was unable directly to contradict much of the testimony against her. Instead, she focused on highlighting discrepancies in the government's case and attacking the FBI's investigation.

Much of Waters' defense was spent trying to convince the jury that she did not agree with ELF's tactics. She testified

that she was "absolutely not" involved in the UW arson because it was "very dangerous to human lives," and she felt "very strongly about not hurting people in any way." Waters also called a number of character witnesses in her defense. These witnesses generally agreed that Waters was kind, peaceful, and responsible. They included an Assistant Attorney General for the State of Washington, Waters' former college professors, a mother whose children Waters had babysat, and some who had worked with Waters during the making of a documentary film. They testified that Waters was not violent and never advocated violence, that she was full of "integrity" and "peacefulness," and that she was "extremely ethical."

After hearing the above testimony, the jury returned a verdict finding Waters guilty of two counts of arson and deadlocked on five other charges. She was later sentenced to six years in prison. She filed a timely appeal, and now raises a number of challenges to the conduct of her trial.

## II.

We begin by reviewing Waters' challenges to the district court's evidentiary rulings. We review a district court's evidentiary rulings for an abuse of discretion and its interpretation of the Federal Rules of Evidence *de novo*. *United States v. Yida*, 498 F.3d 945, 949 (9th Cir. 2007). We also review *de novo* whether a district court's evidentiary rulings violated a defendant's constitutional rights. *United States v. Bahamonde*, 445 F.3d 1225, 1228 n.2 (9th Cir. 2006).

## A.

Waters first contends that the district court erred when it barred her from introducing evidence of government misconduct. She argues that government agents conspired to conceal exculpatory evidence from her, and she asserts that her due

process rights were violated when the district court prohibited her from presenting this theory of the case to the jury.

Waters' theory of government misconduct stems from Kolar's misidentification of Waters at her initial interview with the government. At that interview, as memorialized by the FBI agents' notes, Kolar definitively identified Rodgers as a participant in the robbery, and tentatively identified the other participants as "Capitol Hill girl," her "punk boyfriend," and "Crazy Dan." It is undisputed that none of these nicknames referred to Waters.

The FBI agents' official report of Kolar's interview took more than a month to prepare. In the interim, Kolar came forward with Waters' name. When the FBI agents finalized their report, they did not disclose the nicknames that Kolar had originally provided to them, nicknames that conflicted with Kolar's subsequent statement that Waters was involved. Instead, their report stated only that Kolar had originally identified the arsonists as herself, Rodgers, and "a few other individuals."

As discovery proceeded in Waters' case, the government first produced the FBI's report of Kolar's interview. It took another four months for the government to produce the agents' notes from the interview. Only after this belated production of the agents' notes did Waters learn for the first time that in her initial interview with the FBI Kolar had given a list of participants that did not include Waters, rather than merely failing to identify her as among other, unnamed participants.

The government claimed that the agents had not included the nicknames in their report because Kolar had only been certain of Rodgers' participation at the interview, and had been "thinking out loud" when she provided the nicknames. Waters, however, believed that the FBI had intentionally omitted the nicknames to conceal the discrepancy in Kolar's statements. She therefore moved to dismiss the indictment for

government misconduct. Because the Assistant United States Attorney ("AUSA") who handled her prosecution had participated in Kolar's initial interview, Waters also sought to have him disqualified from the case.

The district court denied both Waters' motion to dismiss the indictment and her motion to disqualify the AUSA. At the same time, it granted an *in limine* motion brought by the government, restricting Waters from arguing that she was the victim of government misconduct or a conspiracy to conceal exculpatory evidence. Waters was allowed to, and did, question the testifying agents about the quality of their work, and about the discrepancy between their notes and the report of Kolar's interview.

On appeal, Waters argues that she should have been allowed to present her evidence of government misconduct to the jury. She also argues that she should have been allowed to implicate the prosecutor, who was present at Kolar's initial interview, in the government misconduct. She asserts that the district court's refusal to let her present this evidence violated her due process rights.

**[1]** We see no error in the district court's evidentiary ruling. A district court has discretion under Federal Rule of Evidence 403 to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. We cannot say that the balance reached by the trial court in this case was an abuse of discretion.

**[2]** To begin with, the probative value of Waters' evidence of a government conspiracy was quite low. While "attack[ing] the reliability of [an] investigation" is an important defense tactic, *see Kyles v. Whitley*, 514 U.S. 419, 446 (1995), Waters' evidence of a larger government conspiracy was

highly speculative. At the time of trial, it consisted entirely of the discrepancy between the FBI report and Kolar's statement.[2] There would be little to gain in encouraging the jury to speculate based upon such a small omission.

[3] In contrast, the downside of encouraging such speculation would be substantial. Allowing Waters to argue that she was the victim of a government conspiracy ran the risk of creating a mini-trial about Kolar's initial interview, the creation of the FBI's interview report, the government's discovery responses, and the prosecution's preparation of its case. Further, allowing Waters to implicate the prosecutor in her theory would have significantly prejudiced the government's ability to present its case — fomenting in the jury a distrust of the government's representative — with no corresponding benefit to the probative value of Waters' theory.

The district court's ruling allowed Waters to argue the substance of her case without risking the prejudice that her speculative theory would have created. Waters questioned the FBI agents at length about the discrepancies between Kolar's interview and the FBI's report. Waters even suggested to the jury in closing argument that the FBI might have "falsif[ied]" the report. This was an acceptable balance. *Cf. United States v. Hankey*, 203 F.3d 1160, 1174-75 (9th Cir. 2000) (affirming exclusion of testimony that police had committed misconduct because "the defense *was* able to present the bulk of the . . . argument to the jury" (emphasis in original)).

---

[2]Waters attempts to buttress her misconduct claim by arguing that Kolar lied about the chain of custody of a folder of anarchist documents that she provided to the FBI after her initial interview. She contends that Kolar's misstatement is additional evidence that the government countenanced the fabrication of evidence in an attempt to convict Waters. The evidence that Kolar was not entirely forthcoming about the folder, however, was never presented to the district court. As discussed below, we are unable to consider this new evidence on direct appeal. *See infra*, n.3.

Given that the district court's evidentiary ruling was well within its discretion, we reject Waters' attempts to "constitutionalize" her claims. While the Constitution certainly affords a criminal defendant "a meaningful opportunity to present a complete defense," *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006), that right is not without limits. Rather, "the Constitution permits judges to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues." *Id.* at 326-27 (internal quotation marks omitted); *see also id.* at 326 ("[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.").

**[4]** Simply put, Waters "cannot transform the exclusion of this evidence into constitutional error by arguing that [s]he was deprived of [her] right to present a defense. The right to present a defense is clearly fundamental, but . . . 'the accused . . . must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' " *United States v. Perkins*, 937 F.2d 1397, 1401 (9th Cir. 1991) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). Given that Waters was able to present the substance of her factual innocence theory, we conclude that the district court's evidentiary ruling achieved the proper balance. Accordingly, we find no constitutional error.

## B.

Waters next objects to the district court's decision to admit a folder of "anarchist literature" at her trial. She contends that the literature was far more prejudicial than probative of any material fact, and that it should have been excluded under Federal Rule of Evidence 403.

The government obtained the folder of documents from Kolar, who claimed that Waters gave it to her sometime after

the UW arson. Consistent with this testimony, the folder (but none of its contents) bore Waters' fingerprints and a note in her hand that said, "Hey, *WO*MAN! Here's some stuff to read that I was telling you about. We'll hang out soon. [Heart] — B."

Waters admitted to giving Kolar a folder of articles, but claimed that the articles she gave Kolar were about "women and activism and vegetarianism," not anarchist political theory. The articles themselves did not have Waters' fingerprints, although some bore fingerprints from Solondz and Kolar.

The government contends that the articles were properly admitted under a number of different theories of relevancy. First, it contends that the articles established an "association" between Waters and Kolar. Second, it contends that the articles were relevant because one of them mentioned the UW arson. Finally, it asserts that the articles were relevant to rebut the character evidence that Waters introduced in her defense.

**[5]** We do not find the articles to be particularly probative of any of these theories. The folder, which was found in Kolar's possession and bore Waters' handwritten note and fingerprints, established that Kolar and Waters were friends; the articles were unnecessary for that purpose. And, while one article mentioned the UW arson, it did so in a brief blurb that occupied less than one-tenth of one page, out of a total of 212 pages of articles.

As for the government's contention that Waters' choice of reading material is probative of her participation in the UW arson, we have repeatedly expressed our discomfort with such inferences. In *United States v. Giese*, 597 F.2d 1170 (9th Cir. 1979), for example, the government offered a book entitled *From the Movement Toward Revolution* against a defendant who had been accused of bombing two Navy recruiting centers in opposition to the Vietnam War. *Id.* at 1174, 1184-93. Although we affirmed the district court's decision to admit

the book into evidence, we emphasized the narrow reach of our holding. *Id.* at 1185 ("[W]e wish to emphasize that we are not establishing a general rule that the government may use a person's reading habits, literary tastes, or political views as evidence against him in a criminal prosecution.").

Our opinion distinguished "between the book as a physical object which bore certain fingerprints and the book as a work of literature which contained a particular message." *Id.* at 1185. We emphasized that the book was initially offered only for the fingerprints it contained, and that "[d]uring the government's case-in-chief not a single word was said by the prosecutors or by any government witness regarding the book's contents." *Id.* Only after the defendant discussed 18 books that he claimed "reflected his left-wing but non-revolutionary political views" did the government gain the right to impeach him with the book's contents. *Id.* at 1189.

Here, the government did not differentiate between the folder as a physical object and the content of the articles it contained. The government introduced the articles as part of its case in chief, having Kolar read select passages for the jury. Although the jury heard of the fingerprints, the content of the articles received far more attention.

**[6]** Although we do not hold that the articles were necessarily inadmissible for any purpose, we observe that a defendant's choice of reading material will rarely have a particularly significant probative value. Thus, attempts to use such evidence against a defendant must be viewed and reviewed with a careful and skeptical eye. *See United States v. Curtin,* 489 F.3d 935, 956 (9th Cir. 2007) (en banc) (noting difficulty with admitting literature against a criminal defendant, and concluding that, while literature may be relevant to intent, its relevancy depends upon the particular facts of the case).

**[7]** We believe that an appropriately skeptical eye would have excluded the articles from Waters' trial, or at least limited the articles that were provided to the jury. In contrast to the article's slight probative value, their content was problematic on many levels. To begin with, the foundation for their admission was weak. Kolar could not positively state that the articles in the folder were the articles that Waters had provided her; instead, she testified that, after glancing at the folder, she placed it in a box and never looked at it again before producing it to her lawyer.[3] Waters testified that the articles introduced into evidence were not the articles she gave Kolar. In addition, there was no evidence that Waters ever read the articles. In fact, the lack of her fingerprints on the articles suggests that she did not.

**[8]** More importantly, however, the articles were highly prejudicial. While most espoused anarchist political theory, a number advocated violence in no uncertain terms. Many of the articles referred to deriving a disturbing joyfulness from acts of destruction, glorifying actions such as rioting and looting. They included phrases like "[i]n the heart of a riot one can catch a glimpse of the spirit of the revolt without a price," and references to the "glee of the looter" and the "festive

---

[3]After the district court entered its judgment, Kolar's lawyer came forward and told the government that Kolar's statements about the chain of custody of the folder were not entirely accurate. Initially, Kolar told the FBI that she had put the folder in a plastic tub, where it sat undisturbed until she produced it to her lawyer. It was later disclosed, however, that a friend of Kolar's removed the tub from Kolar's house after the FBI made its first arrests in this case. Kolar's lawyer subsequently obtained the tub from this friend, and returned it to Kolar for a brief period, before he ultimately produced it to the government.

Waters contends that this admission destroys the chain of custody of the documents and is further evidence of a conspiracy to frame her for the arson. We are unable, however, to consider this new evidence on appeal. *See Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1511 n.5 (9th Cir. 1994) ("Facts not presented to the district court are not part of the record on appeal."); Fed. R. App. P. 10. Waters must first present this evidence to the district court before we may consider it.

atmosphere in the midst of the battle with the forces of the looter." One article described "bashing in the skull of society" as "an intense pleasure . . . to be savored."

Other articles explicitly advocated the destruction of society, encouraging readers to "com[e] together to destroy all domination," and advocating for a "strong-willed revolt aimed at developing a revolutionary project that can destroy this society and its institutions." Perhaps the most problematic article was entitled "Beyond the E.L.F." It condemned the "westernized way of life," and emphasized the need for "guerrilla tactics in the form of economic sabotage and beyond." It suggested that anarchists "choos[e] targets that have the most impact," such as "symbolic targets that if destroyed would place a major blow to the false reality [of U.S. society]." It concluded: "Think big. Wall Street, the stock market, Statue of Liberty, U.S. Capitol, . . . Disneyland, . . . government agencies . . . . Realize the difference between pulling up an acre of [genetically engineered] crops and destroying Monsanto. . . . The difference between spray paint and fire."

[9] These passages are highly prejudicial, and even if the record demonstrated an adequate analysis by the district court we would be inclined to hold that admitting them was an abuse of discretion. Their repugnant and self-absorbed embrace of destruction is likely to have swayed jurors' emotions, leading them to convict Waters not because of the facts before them but because she represented a threat to their own values. We need not reach this question, however, because the district court did not properly exercise its discretion. The district court admitted the articles without ever reviewing them.[4] Our case law establishes that this was error.

_____

[4]The record does not definitively establish that the district court never reviewed the articles. It does strongly suggest, however, that the court did not. When considering Waters' motion to exclude the articles, Waters' counsel noted that the court had not reviewed the documents. He pointed out that "the government hasn't brought them into court so the court can

The district court's admission of the documents is controlled by our en banc decision in *Curtin*, which involved the prosecution of a man for traveling across state lines with the intent to engage in a sexual act with a minor. When the defendant was arrested, his "personal digital assistant" was found to contain "in the form of text over 140 stories about adults having sex with children." 489 F.3d at 938. The government sought to introduce the stories into evidence in order to establish Curtin's intent to engage in sexual acts with what he believed was a 14-year old girl. *Id.* at 939-40.

The district court allowed the government to introduce five of the stories into evidence, but it appears that no one — neither the district judge nor the attorneys — had read the stories in their entirety. *See id.* at 957, 958 n.9. Only during en banc proceedings did this court discover that, "[l]urking in unread paragraph 9 of . . . Exhibit 7C," was a "graphic description" of a young girl performing acts of bestiality. *Id.* at 957. As the en banc court observed, "[t]he acts described are enough to sour the stomach. Under no circumstances was this part of Exhibit 7C admissible with respect to any issue in this case. Had the district court read Exhibit 7C, the court would no doubt have spotted this excrescence and required that it be edited out of the exhibit as both irrelevant and dangerously prejudicial." *Id.*

In light of this discovery, the en banc court held that the district court was "required to have read every word of these stories when exercising its balancing discretion pursuant to

---

see them all, and for the court to go through and make its own determination as to what's relevant and what's not." This statement was not challenged. At trial, when the defense renewed its objection to the materials, the court gave no indication that it had read the articles.

Although the record does not expressly indicate whether the district court read the articles, at oral argument before this court, the government confirmed what the record suggests — that the district judge had not reviewed them.

Rule 403 to determine whether their potential for undue preju-
dice substantially outweighed their probative value." *Id.* at
957. It made this a requirement for all district courts when
performing the 403 balancing test. *See id.* at 958 ("[W]e hold
as a matter of law that a court does not properly exercise its
balancing discretion under Rule 403 when it fails to place on
the scales and personally examine and evaluate all that it must
weigh.").

**[10]** Our decision in *Curtin* controls this case. The district
court had the responsibility to read every page of the articles
in order properly to understand their contents before ruling on
their admissibility. Its failure to do so means that it could not
have properly weighed the impact of the articles under Rule
403. Accordingly, we hold that the district court's admitting
the folder of anarchist literature constituted an abuse of dis-
cretion.

### C.

Waters next contends that the district court erred when it
denied her request to show the jury a documentary film that
Waters produced before and during the time period of the UW
arson. The film, entitled *Watch*, documented a peaceful pro-
test against a clear-cutting project in Randle, Washington.
Waters produced and filmed the video herself, beginning in
1999 and continuing for a number of years. She offered it into
evidence to establish that she was devoted to peaceful means
of protest, and to rebut the prosecution's evidence suggesting
that she identified with ELF's tactics.

**[11]** Assessed independently, whether the district court's
decision to exclude the video was an abuse of discretion pres-
ents a close question. Many of the video's facts came out dur-
ing the course of trial, and a number of Waters' character
witnesses testified about her role in the documentary. Thus,
although she was unable to show the jury the video, she was
able to present the substance of her defense.

**[12]** In light of the district court's decision to allow the anarchist literature into evidence, however, excluding the video was certainly an abuse of discretion. The district court's rulings allowed the government to rely on "other acts" evidence to establish that Waters identified with ELF's goals and tactics, while prohibiting Waters from rebutting that evidence with evidence that demonstrated her commitment to the values she claimed to hold. These rulings, in combination, assured that the jury would be provided with a one-sided picture of Waters. The jury saw her connected to violent anarchist propaganda that it may have had a visceral reaction to, while it was prevented from viewing evidence that would paint a contrasting picture of Waters as a person. Given the imbalance in the evidence that resulted from the district court's rulings, we hold that the district court abused its discretion when it excluded the video in these circumstances.

### D.

**[13]** The final evidentiary error Waters raises is the district court's decision to exclude Waters' out-of-court statements to her cousin, Robert Corrina. After she was contacted by the FBI, Waters called Corrina to inform him that the FBI might interview him. During this conversation, Waters told Corrina that she was innocent and that he should tell the FBI the truth. At her trial, Waters attempted to introduce these statements into evidence to show her lack of a guilty mindset, but the district court excluded the statements on hearsay grounds. *See* Fed. R. Evid. 801.

**[14]** The district court's application of Rule 801(a) was only half correct. The first part of Waters' statement — that she was innocent — is clearly hearsay, and was therefore properly excluded under Rule 801(a). The second part, however — Waters' admonition to Corrina that he should "tell the truth" — does not fall within the definition of hearsay. "Tell the truth" is an imperative and not an assertion of fact. It therefore does not fall within the meaning of "statement" in

Rule 801(a) and cannot be hearsay, because a nonassertion cannot have been offered to prove the truth of the matter asserted. *See United States v. Hayes*, 369 F.3d 564, 568 (D.C. Cir. 2004) ("The imperative 'tell the truth' does not expressly assert anything."). Accordingly, we hold that the district court erred when it prevented Corrina from testifying to the fact that Waters told him to tell the truth.

### E.

**[15]** Given that the district court made a number of erroneous evidentiary rulings, we must determine whether the errors were harmless. *See United States v. Liera*, 585 F.3d 1237, 1244 (9th Cir. 2009). The government bears the burden of proving harmlessness, and must demonstrate that "it is more probable than not that the error[s] did not materially affect the verdict." *Id.* While we doubt that the erroneous exclusion of Waters' statement to her cousin had a substantial impact on her trial, the remaining two errors were sufficiently prejudicial to require reversal.[5]

The government has not carried its burden of convincing us that the admission of the anarchist literature was harmless. As we have already described, the anarchist literature was highly prejudicial. It contained a number of inflammatory statements glorifying violence, advocating destruction, and calling for an end to society. It endorsed attacks on symbols of American culture — symbols that many jurors likely held dear — such as the Capitol Building, the Statue of Liberty, and Disneyland. Rather than contributing to any issue in the case, it played to the jury's emotions, encouraging it to convict because it

---

[5]Although Corrina did not testify about the precise statements that the district court excluded, he did testify that Waters never asked him to lie. Moreover, Waters described the conversation in her own testimony and said, without objection from the government, that she told Corrina, "I am innocent and just tell the truth." Thus, even though the exact statements were excluded, their substance was presented to the jury.

believed Waters held loathsome views that threatened the
jurors' way of life.

No doubt recognizing the impact these articles would have
on the jury, the prosecutor emphasized this prejudicial inter-
pretation of the articles during his closing argument. Impor-
tantly, the prosecutor did not emphasize the government's
theory that the articles showed a connection between Waters
and Kolar, nor did he argue that the articles demonstrated a
shared conspiratorial objective. Rather, the prosecutor argued
that the articles represented Waters' values: "[c]learly she
thinks these [articles] are important." He highlighted the fact
that she had selected the specific articles that were in the
folder, inviting the jury to convict not because of the articles'
existence, but because of their content: "I didn't choose these
articles to put in here. She did. [¶] What are these articles
about? They are anarchist articles. The only way to really
save the earth is to destroy capitalism. The Defendant chooses
to select these articles and send them to her co-conspirator
and say let's talk about them . . . ."

**[16]** We have previously found the admission of violent
texts, such as the anarchist material at issue here, prejudicial
enough to warrant reversal. In *United States v. Ellis*, 147 F.3d
1131 (9th Cir. 1998), for example, we reversed a conviction
after the government introduced a copy of "The Anarchist's
Cookbook" into evidence. *Id.* at 1136 ("The government's
reliance on this evidence created a grave danger that the
defendant's guilt was established *not* by evidence relevant to
the particular offense being tried, but rather by evidence that
was wholly unrelated to these offenses." (internal quotation
marks omitted)). In this case, as in *Ellis*, materials advocating
violence, not to mention the overthrow of government, were
"likely to elicit a response from jurors that cause[d] them to
reach a conclusion based on emotion rather than the evidence
presented." *Id.*

**[17]** The erroneous exclusion of the *Watch* video com-
pounded this error, depriving Waters of her opportunity to

demonstrate that her purported belief in non-violence was genuine and to rebut the government's contrary showing. We are convinced that, "[t]aken together, the wrongful admission of [the government's evidence] and the erroneous exclusion of [the defense evidence] left the jury with only half the picture." *Parle v. Runnels*, 505 F.3d 922, 932 (9th Cir. 2007).

**[18]** We find it probable that the district court's evidentiary errors had a material effect on Waters' verdict. Accordingly, her conviction must be reversed. *See Liera*, 585 F.3d at 1244.

## III.

Waters also raises two challenges to her conviction based upon her assertion that the district court inappropriately closed her pretrial proceedings to the public. First, Waters claims that the district court committed structural error by closing an "omnibus" pretrial hearing to the public. Second, she argues that the district court erred by effectively closing jury selection. We review these public-trial claims claim *de novo*. *United States v. Shryock*, 342 F.3d 948, 974 (9th Cir. 2003).

## A.

The omnibus pretrial hearing took place on January 29, 2008. At the closed hearing, Waters was arraigned on the Fourth Superseding Indictment.[6] The district court also addressed a number of administrative matters at the hearing, including motions *in limine*. The district court closed the hearing to the public, although Waters' life partner was allowed to attend.

---

[6]Before the district court, Waters argued that her arraignment should have been in open court. In her opening brief, however, she did not renew this argument, and has therefore waived it. *See Harger v. Dep't of Labor*, 569 F.3d 898, 904 n.9 (9th Cir. 2009).

Waters objected to the closure, noting that there were members of the public and of the press who wanted to observe the hearing, but the district court refused to open it. The only explanation the court offered was the statement that the hearing was "closed because that's the type of hearing that it is." The court also mentioned its desire "to get the matter ready to go to trial without any interruptions."

**[19]** Waters contends that the closed hearing violated her Sixth Amendment right to a public trial. She asserts that the error is structural and must result in automatic reversal. We agree with Waters that the pretrial hearing should have been conducted in open court, although we do not agree that the error was structural.

As a preliminary matter, we must determine if Waters' public-trial right attached to the hearing at issue. Although the Sixth Amendment refers to a "public trial," the right encompasses more than the trial itself. "The right to a public trial is not limited to issues that arise after a jury is sworn or times when the jury is present." *Rovinsky v. McKaskle*, 722 F.2d 197, 201 (5th Cir. 1984) (en banc). Rather, it "extends at least to those pretrial hearings that are an integral part of the trial, such as jury selection and motions to suppress evidence." *Id.*

We have previously stated that the public-trial right attaches to those hearings whose subject matter "involve[s] the values that the right to a public trial serves." *United States v. Ivester*, 316 F.3d 955, 960 (9th Cir. 2003). Those values are:

> (1) to ensure a fair trial, (2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, (3) to encourage witnesses to come forward, and (4) to discourage perjury.

*Id.* (quoting *Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir. 1996)).

**[20]** It is well established that the Sixth Amendment right to a public trial attaches to suppression hearings. The Supreme Court has held as much: "The[ ] aims and interests [of the right to a public trial] are no less pressing in a hearing to suppress wrongfully seized evidence. . . . [S]uppression hearings often are as important as the trial itself." *Waller v. Georgia*, 467 U.S. 39, 46 (1984). Not only is a motion to suppress a fundamentally important stage of the trial, but the public also has an interest in having allegations of government misconduct heard in an open forum.

> The need for an open proceeding may be particularly strong with respect to suppression hearings. A challenge to the seizure of evidence frequently attacks the conduct of police and prosecutor. As the Court of Appeals for the Third Circuit has noted, "[s]trong pressures are naturally at work on the prosecution's witnesses to justify the propriety of their conduct in obtaining" the evidence. The public in general also has a strong interest in exposing substantial allegations of police misconduct to the salutary effects of public scrutiny.

*Id.* at 47 (internal citation omitted).

**[21]** The hearing in this case was not technically a suppression hearing. Nevertheless, we believe that the hearing implicated the values outlined above, and we therefore conclude that Waters' hearing should have been open to the public.

**[22]** One major issue the district court heard at the omnibus hearing was Waters' motion to dismiss the indictment for government misconduct. In many respects, this motion resembled a motion to suppress evidence. Waters' motion directly challenged the tactics the government used in investigating her case. *Cf. Ivester*, 316 F.3d at 960 (affirming closure of pretrial hearing based in part on fact that the defendant "did not attack the government"). The hearing would therefore

have benefitted from the "salutary effects of public scrutiny." *Waller*, 467 U.S. at 47. Opening the hearing to the public might have encouraged other witnesses to come forward and discouraged perjury. Further, as with any allegation of misconduct, government agents must be reminded of their "responsibility to the accused and the importance of their function." *Id.* Last but not least, the public has an interest in learning of all allegations of government misconduct, including prosecutorial misconduct.

Having concluded that Waters' Sixth Amendment public-trial rights attached to her pretrial hearing, we hold that the district court erred by closing the hearing to the public. The Supreme Court recently articulated the standard that governs whether a hearing should be closed:

> The party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Presley v. Georgia*, 130 S. Ct. 721, 724 (2010) (per curiam).

Here, the government did not seek to close the hearing and advanced no interest that would be prejudiced by closure. Likewise, the district court provided only conclusory statements in support of its decision to close the hearing, stating that the hearing would be closed "because that's the type of hearing it is," and expressing the need to "get the matter ready to go to trial without any interruptions." While "[t]he right to a public trial has always been interpreted as being subject to the trial judge's power to keep order in the courtroom," *United States v. Hernandez*, 608 F.2d 741, 747 (9th Cir. 1979), there is no indication that the public's presence would have had any disruptive effect on the hearing. Further, the dis-

trict court failed to consider any alternatives to closing the courtroom.

**[23]** Waters argues that the closure of the hearing should be considered structural error, resulting in automatic reversal of her conviction. We disagree. In the context of suppression hearings, the Supreme Court has stated that while "the defendant should not be required to prove specific prejudice in order to obtain relief," automatic reversal is not required. *Waller*, 467 U.S. at 49. Rather, "the remedy should be appropriate to the violation." *Id.* at 50. In *Waller*, for example, the Supreme Court did not reverse the defendant's conviction, but remanded for "a new, public suppression hearing." *Id.*

**[24]** Were we otherwise affirming Waters' conviction, deciding what relief Waters is entitled to would be a difficult question. Her public-trial right in the omnibus pretrial hearing is doubtless important, but it may have been vindicated by the public availability of a transcript. *See id.* (concluding that a new, public suppression hearing would vindicate the defendant's Sixth Amendment rights). We need not, however, decide how to resolve this question at this time. On remand, the district court should ensure that Waters' Sixth Amendment rights are protected by conducting any pretrial hearing on Waters' allegations of government misconduct, or similar issues, in public.

## B.

Waters' second public-trial claim concerns jury selection in her case. When jury selection began, the court noted that it was aware of a concern "about the courtroom being open to the public," and assured the parties that the courtroom would remain open. The procedure the judge used, however, prevented most of the public from observing the jury selection proceedings. The judge explained that there were many people in the venire and that he planned to seat all of them first and then allow members of the public to fill the remaining

seats. Waters objected, arguing that "if there are too many jurors and not enough seats for the public, then we need to get a larger courtroom." The court rejected Waters suggestion that they transfer courtrooms, stating that Waters' request would "be accommodated the best we can, but we are going to ask you to let the jury be seated first."

At a break in *voir dire* proceedings, Waters' counsel stated for the record that "the court had two chairs brought in, and at the beginning of jury selection three spectators were allowed in, but . . . there were a large number of people denied entrance." Her counsel estimated that between 15 and 25 would-be spectators were not allowed to watch the proceeding.

Waters raised this claim for the first time after briefing before this court had been completed. She attributes her tardiness to the Supreme Court's decision in *Presley v. Georgia*, 130 S. Ct. 721 (2010) (per curiam), which was decided after briefing was completed. In *Presley*, the Supreme Court reversed a conviction after a single individual was excluded from the courtroom during *voir dire*, holding that "trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Id.* at 725.

Given our disposition of Waters' other claims, we need not decide whether the district court's actions were "reasonable," or whether Waters waived this claim by failing to raise it in her opening brief. We emphasize, however, that the right to a public trial is an important right not only to a criminal defendant, but also to the public at large. *See id.* at 724-25. In cases where public interest is high, reasonableness may require the court to depart from its normal procedures to accommodate that interest. Should the issue arise again on remand, we are confident that, in light of *Presley*, the district court will take such measures as are necessary in order to accommodate the right to a public trial.

**IV.**

Waters next argues that the district court conducted an inadequate inquiry into adverse publicity that occurred during jury deliberations. We review a district court's actions regarding alleged improper influences on the jurors' deliberation for abuse of discretion. *United States v. Smith*, 790 F.2d 789, 795 (9th Cir. 1986).

The jury began its deliberations on Friday, February 29, 2008. On the morning of Monday, March 3, before the jury was to resume deliberations following its weekend break, the local media reported that an arson had just occurred in Woodinville, Washington. The fire, which targeted houses on the "Street of Dreams" outside of Seattle, destroyed three homes and caused approximately $7 million in damages. Materials left at the fire indicated that ELF was responsible.

Before the jury began deliberating for the day, defense counsel informed the court that the Woodinville fire had been a prominent news story and that many news outlets were reporting that ELF was responsible. Some of the news coverage expressly mentioned Waters. Counsel therefore asked the court to question the jurors individually to determine if any of them had seen or heard the reports.

The court declined to question the jurors individually. Instead, it assembled the entire jury and asked the following question:

> There's been a news story this morning on the news that could possibly influence or affect your deliberations. The Court has instructed you on your duties and responsibilities as jurors, and admonishing you as you go home from day to day and all of that.
>
> Any of you now heard anything about this that you cannot set aside, or it would influence your delibera-

tions here; anybody heard anything that would be
different than the instructions I have given you as to
what evidence you are to take to decide this case?
Anybody that can't do that?

No juror indicated that the news story would affect her delib-
erations. The court then sent the jury to continue deliberating,
instructing it "to follow the law as I have given it to you and
carry that out and perform that function in that fashion."

The defense moved for a mistrial because of the news cov-
erage, but the court denied the motion. Defense counsel later
renewed his motion, filing an exhibit with examples of the
news coverage, but the court adhered to its denial.

We must decide if the procedures the court followed were
adequate to address and resolve the risk of prejudice, and
must reverse if we conclude that "the probability of prejudice
arose and was not eliminated."[7] *Smith*, 790 F.2d at 795 (quot-
ing *Silverthorne v. United States*, 400 F.2d 627, 644 (9th Cir.
1968)). In doing so, we are cognizant of the fact that a district
court is in a far better position to gauge the impact of adverse
publicity on a jury than we are. In analogous circumstances,
we have cautioned that "[u]nless a trial judge clearly has erred

---

[7]We have not previously addressed the procedures that a district court
should follow when adverse publicity occurs *during* deliberations. The
Second Circuit requires district courts to conduct a three-step analysis to
gauge the effect of adverse publicity on a jury:

[F]irst, to determine whether the coverage has a potential for
unfair prejudice, second, to canvass the jury to find out if they
have learned of the potentially prejudicial publicity and, third, to
examine individually exposed jurors — outside the presence of
the other jurors — to ascertain how much they know of the dis-
tracting publicity and what effect, if any, it has had on that juror's
ability to decide the case fairly.

*United States v. McDonough*, 56 F.3d 381, 386 (2d Cir. 1995). Although
we do not disagree with the Second Circuit's approach, we do not find it
necessary to adopt a specific protocol at this time.

in his estimation of the action needed to uncover and prevent prejudice from pretrial publicity, an appellate court should not intervene and impose its estimate." *United States v. Polizzi*, 500 F.2d 856, 880 (9th Cir. 1974).

**[25]** Nevertheless, we agree with Waters that the district court's statements to the jury were inadequate in light of the highly prejudicial nature of the publicity. Indeed, although district courts have discretion on these matters "discretion is not a substitute for duty." *Silverthorne*, 400 F.2d at 637. Thus, when "publicity is great, the trial judge must exercise correspondingly great care in all aspects of the case relating to publicity which might tend to defeat or impair the rights of an accused." *Id.* at 637-38.

The news stories covered an arson committed by the ELF, the same group of which Waters was accused of being a member. The stories not only may have caused a juror to ignore the evidence at trial and convict as an emotional reaction to this latest crime, they may also have suggested to the jury that there was a link between the arson and Waters. Indeed, a number of news outlets commented on the connection between the arson and jury deliberations in Waters' trial.

**[26]** The district court's statement only minimally addressed this potential prejudice. It did nothing to determine whether any juror had read or heard about the news stories, let alone to determine how, if at all, any juror who knew of the publicity was affected by it. Instead, the court posed a general, compound question to the jurors en masse, vaguely asking whether any juror could not set aside in deliberations anything learned. In light of the high risk of prejudice caused by the publicity, we conclude that the "probability of prejudice arose" and that the district court's single, general question to the group was insufficient to eliminate it. *See Smith*, 790 F.2d at 795; *see also Polizzi*, 500 F.2d at 879 (explaining in the pretrial publicity context that when there is "substantial" publicity the inquiry "must not simply call for the jurors'

subjective assessment of their own impartiality, and it must not be so general that it does not adequately probe the possibility of prejudice").

   As a result of the district court's failure to make adequate inquiries regarding the news stories, we do not know whether any juror heard any of the information. If any juror was exposed to the publicity, we do not know the impact of that publicity on the juror. Given the high risk of prejudice that could have been caused by the publicity and our lack of reliable information as to the actual impact, we have no choice but to reverse.

   **[27]** Accordingly, we conclude that the district court's inadequate inquiry into this incident constitutes an independent ground for reversal.[8]

## V.

   Finally, Waters claims that the district court erred when it denied her motion for the production of surveillance materials. We review this claim for abuse of discretion. *United States v. Bissell*, 634 F.2d 1228, 1233 (9th Cir. 1980).

   Waters bases her request for the production of surveillance materials exclusively on 18 U.S.C. § 3504. That section requires the government to disclose whether or not a party was the victim of illegal surveillance. *See* 18 U.S.C. § 3504 ("[U]pon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act

---

[8]The district court's inadequate inquiry was exacerbated by the court's later order prohibiting all contact between counsel and the jurors. With this no-contact order in place, Waters' counsel was unable to determine whether any juror was affected by the adverse publicity. In light of our disposition of this case, we need not decide if the district court erred in issuing its no-contact order. Because we reverse Waters' conviction, however, we also vacate the order.

. . . the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act.").

[28] A party's right to learn of illegal surveillance is not absolute. "[B]ecause responding to ill-founded claims of electronic surveillance would place an awesome burden on the government, a claim of government electronic surveillance of a party must be sufficiently concrete and specific" before the government must respond. *United States v. Tobias*, 836 F.2d 449, 452-53 (9th Cir. 1988). And when the government does respond, "the specificity . . . of the government's response is measured by the specificity and strength of the witness's allegations." *In re Grand Jury Investigation*, 437 F.3d 855, 857 (9th Cir. 2006) (per curiam). A "general or unsupportable claim requires only a general response." *Id.* (internal quotation marks and citation omitted).

Waters' request for disclosure of surveillance materials was neither concrete nor specific. Her motion relied only on generalized statements about government surveillance programs and included no direct evidence that suggested that she was subjected to warrantless wiretapping or other forms of illegal surveillance.

In light of the general nature of Waters' showing, we cannot say that the district court abused its discretion in denying Waters' motion. The government's responsive pleadings asserted that it had or would soon produce "all of the surveillance materials obtained, or received, by the various agencies involved in this investigation during the course of the investigation." The government also represented that "[n]o other electronic surveillance was conducted or assembled by anyone connected with this investigation."

[29] The government's response was commensurate with Waters' showing. Accordingly, we find no error in the district court's ruling.

19354                    UNITED STATES v. WATERS

## VI.

While the evidence against Waters may have been suffi-
cient to sustain her conviction, our review of the record does
not leave us convinced that her conviction was fairly
obtained. The judgment of the district court is therefore
reversed and the case remanded for further proceedings con-
sistent with this opinion. The district court's no-contact order
is vacated.

**REVERSED and REMANDED.**