Judge Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BRIANA WATERS, ) <br> ) <br> Defendant. ) <br> _____) | NO. CR05-5828RBL <br><br> GOVERNMENT'S SENTENCING MEMORANDUM |

Comes now the United States of America, by and through Jenny A. Durkan, United States Attorney for the Western District of Washington, and Andrew C. Friedman and Thomas M. Woods, Assistant United States Attorneys for said District, and files this Government's Sentencing Memorandum.

## I. INTRODUCTION

Defendant, Briana Waters, is before the Court for sentencing following her guilty pleas to conspiracy, in violation of 18 U.S.C. § 371, possessing an unregistered firearm, in violation of 26 U.S.C. § 5861(d), arson, in violation of 18 U.S.C. § 844(i), and using a destructive device, in violation of 18 U.S.C. § 924(c). Waters is scheduled to be sentenced at 9:00 a.m. on June 22, 2012.

Waters' convictions are the result of her participation in two arsons committed on behalf of the Earth Liberation Front (ELF) and the Animal Liberation Front (ALF), namely, (1) the May 21, 2001, arson of the University of Washington Center for Urban Horticulture, and (2) the October 15, 2001, arson of the Bureau of Land Management, Litchfield Wild Burrow & Horse Corrals, in Susanville, California. The Center for Urban

Horticulture arson, in particular, was a horrific crime. It endangered firefighters who fought to control the towering blaze. It destroyed an entire building devoted to the study of botany, resulting in more than $6 million in damage. It set back the research and careers of countless professors, researchers, and students, who saw years of work consumed in flames. And it terrorized occupants of the building, many of whom suffered long-lasting emotional damage (in some cases, so severe that it caused them to move elsewhere or change career).

  Following her initial conviction at trial, and the reversal of that conviction by the Ninth Circuit based upon an evidentiary ruling, Waters agreed to cooperate against the last remaining defendant in the Center for Urban Horticulture arson, Justin Solondz. As a result, the parties entered into an agreement under which they both have agreed to recommend a sentence of 48 months' imprisonment, a recommendation in which the Probation Office also has joined. As explained in greater detail below, this sentence reflects the fact that Waters originally was sentenced to 72 months, and should receive some benefit for cooperating. This sentence also punishes Waters proportionately to the other participants in the conspiracy, taking account of Waters' role in the conspiracy (and, specifically, the fact that Waters participated in two arsons).

  Any lesser sentence would fail to reflect the fact that Waters' sentence necessarily should be measurably longer than her co-defendant Lacey Phillabaum's 36-month sentence, since (1) Phillabaum participated in only one arson, but Waters participated in two; (2) unlike Phillabaum, who accepted responsibility for her crimes immediately, Waters went to trial, perjured herself at that trial, and presented a defense that she had been framed including by the FBI (which was particularly harmful, given that it likely reinforced many of Waters' supporters' beliefs that authorities, and, in particular, law enforcement, cannot be trusted); and (3) Waters deserves a lesser benefit than Phillabaum based upon the matters, and for the reasons, described in the Government's Filing Concerning Defendant's Sentencing. As a result, the Court should sentence Waters to 48 months' imprisonment, as provided by the Plea Agreement.

## II. **FACTS**

In 2001, Waters was acquainted with William Rodgers, one of the leaders of a group that previously had committed multiple arsons on behalf of ELF and ALF. *See* Plea Agreement ¶ 7. Rodgers told Waters that he was planning to commit an "action" targeted at the office of Professor Toby Bradshaw, a Professor at the University of Washington Center for Urban Horticulture, and asked Waters to participate. *See id.* Waters understood that the motivation for this action was that Professor Bradshaw supposedly was involved in genetic engineering of poplar trees, research that Rodgers and Waters opposed because they believed it harmed the environment. *See id.* In fact, Professor Bradshaw's research did not involve genetic engineering, but rather involved traditional cross-breeding of trees.

Waters agreed to participate, and attended a series of meetings with Rodgers, Jennifer Kolar, Lacey Phillabaum, and Waters' then-boyfriend, Justin Solondz, during which they made plans to set fire to Professor Bradshaw's office. *See id.* Waters agreed to obtain a car to be used for transportation to and from the arson, and subsequently persuaded an unwitting relative to rent a car for Waters. *See id.* Waters also permitted others, including Solondz, to manufacture incendiary devices in the garage of a house at which Waters was living. *See id.*

On the evening of May 20, 2001, Waters and her co-conspirators drove to the Center for Urban Horticulture with the incendiary devices Solondz had made. *See id.* In the early morning hours of May 21, 2001, Waters hid in some nearby bushes and served as a lookout, while three of the others walked to the Center for Urban Horticulture and used the incendiary devices to start a fire in Professor Bradshaw's office. *See id.* The devices produced a huge fire that destroyed the entire Center for Urban Horticulture, causing more than $6 million of damage. *See id.* The towering fire endangered firefighters, destroyed a substantial portion of a library containing rare horticulture books, and destroyed substantial samples of endangered plant species contained in the Center for Urban Horticulture. It also had an enormous impact on professors and students working in the building, setting their research back years, causing some even to change careers,

and causing many to suffer long-lasting emotional impact, including fear of further attacks.

Unlike Phillabaum, who saw the results of the arson, and turned away from further such crimes, Waters participated in another arson a few months laters. Specifically, in September 2001, Waters participated in a horse release and arson at the Bureau of Land Management, Litchfield Wild Burro & Horse Corrals in Susanville, California. *See id.* Waters and her coconspirators committed this arson because they objected to the BLM's treatment, and in some cases slaughter, of wild horses. The Litchfield Wild Burro & Horse Corrals arson was the last arson committed by Rodgers' ELF/ALF cell. Perhaps as a result, it also marked Waters' last participation in ELF/ALF arsons.

### III.  PRESENTENCE REPORT

The Government has no objection either to the facts, or the calculation of Waters' sentencing range, set forth in the Presentence Report. The Presentence Report calculates Waters' sentence using the November 2011 Guidelines Manual, since this results in the same offense level as the Sentencing Guidelines in effect at the time of Waters' sentencing. *See* USSG § 1B1.11 (court should apply the Guidelines Manual in effect on the date that offense of conviction was committed where necessary to avoid violating the *ex post facto* clause of the United States Constitution); PSR ¶ 22.

A.  **The Presentence Report Correctly Applies a Base Offense Level of 24.**

As the Presentence Report notes, Waters' offense is governed by Section 2K1.4 of the Sentencing Guidelines. PSR ¶ 25. Section 2K1.4, provides that a defendant has a base offense level of 24, if the defendant's crime caused the destruction of "a state or government facility," or "a place of public use," or if the defendant's crime created "a substantial risk of death or serious bodily injury." *See* USSG § 2K1.4(a)(1)(A), (B). Waters' crime qualifies under all of these tests. The Center for Urban Horticulture, which is part of the University of Washington, is both a state government facility and a place of public use. The Litchfield Wild Burro & Horse Corrals, which belonged to the Bureau of Land Management, is a federal government facility. And the arson of the Center for

Urban Horticulture created a substantial risk of death to responding firefighters. For all of these reasons, the Presentence Report correctly recommends a base offense level of 24. *See* PSR ¶ 25.

**B.     The Presentence Report Correctly Applies an Adjustment because Waters' Crime is a "Federal Crime of Terrorism."**

The Presentence Report correctly applies an adjustment under Section 3A1.4 of the Sentencing Guidelines because Waters' crime is a "federal crime of terrorism." *See* PSR ¶ 27. Although Waters' crime is substantively different from, say, the attacks of September 11, 2001 -- a fact recognized in the Government's recommendation of a sentence far below Waters' guidelines sentencing range -- it is clear that the crime still falls within the definition of a "federal crime of terrorism." Judge Burgess applied this adjustment in sentencing two of Waters' co-defendants, Phillabaum and Kolar, as well as Waters herself, at her original sentencing, and this Court has applied the adjustment in sentencing Solondz. *See also United States v. Thurston*, 2007 U.S. Dist. LEXIS 38185 (D. Ore. May 21, 2007), *aff'd*, 537 F.3d 1100 (9th Cir. 2008) (applying the adjustment to other members of Rodgers' ELF/ALF cell who targeted government buildings in States other than Washington); *United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009) (applying adjustment against another member of ELF/ALF).

Section 3A1.4 of the Sentencing Guidelines provides that, where a defendant is convicted of "a felony that involved, or was intended to promote, a federal crime of terrorism" the defendant's offense level should be increased by 12 levels, and the defendant's criminal history category should be increased to Category VI. USSG § 3A1.4. The commentary to Section 3A1.4 provides that the term "'federal crime of terrorism' is defined at 18 U.S.C. § 2332b(g)." *Id.* comment. (n.1). That statute defines a federal crime of terrorism to "mean[] an offense that -- (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and B) is a violation of" any of a number of statutes, including 18 U.S.C. § 844(i). 18 U.S.C. § 2332b(g)(5).

Waters meets both prongs of this definition. First, Waters has pled guilty to violating 18 U.S.C. § 844(i), which is one of the qualifying predicate statutes. Second, her crime was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Kolar testified that the Center for Urban Horticulture was selected as a target because "th[e] group as a whole had agreed on trying to pick a single topic to focus on, that we thought might be winnable, and genetic engineering was decided to be that topic" and because "Toby Bradshaw was a researcher there doing genetic engineering." Tr. at 1333-34.

The communique issued after the arson confirms these facts. That communique (which also claimed responsibility for the simultaneous arson of Jefferson Poplar Farm) read

> Part 1
>
> At 3:15 am on Monday, May 21, the research of Toby Bradshaw was reduced to smoke and ashes. We attacked his office at the University of Washington while at the same time another group set fire to a related target in Clatskanie, Oregon, 150 miles away.
>
> Bradshaw, the driving force in G.E. tree research, continues to unleash mutant genes into the environment that is certain to cause irreversible harm to forest ecosystems.
>
> After breaking into Bradshaw's office at the Center for Urban Horticulture, we inspected the building for occupants and set up incendiary devices with a modest amount of accelerant. Although we placed these devices specifically to target his office, a large portion of the building was damaged. This extensive damage was due to a surprisingly slow and poorly coordinated response from the fire department, which was evident by their radio transmissions.
>
> As long as universities continue to pursue this reckless "science," they run the risk of suffering severe losses. Our message remains clear: we are determined to stop genetic engineering.
>
> From the torching of Catherine I've's office at Michigan State University to the total incineration of GE seeds at the D & PL warehouse in Visalia, CA, the Earth Liberation Front is growing and spreading. As the culture of domination forces itself into our very genes, wild fires of outrage will continue to blaze.
>
> ELF

Part 2

> Early Monday morning, May 21, we dealt a blow to one of the many institutions responsible for massive hybrid tree farming in the Northwest. Incendiary devices at Jefferson Poplar in Clatskanie, Oregon, burned an office and a fleet of 13 trucks. Unfortunately, due to a design flaw, one targeted structure was left standing. We torched Jefferson Poplar because hybrid poplars are an ecological nightmare threatening native biodiversity in the ecosystem. Our forests are being liquidated and replaced with monocultured tree farms so greedy, earth raping corporations can make more money.
>
> Pending legislation in Oregon and Washington further criminalizing direct action in defense of the wild will not stop us and only highlights the fragility of the ecocidal empire.
>
> As we wrote in Clatskanie "You cannot control what is wild."
>
> ELF
>
> Earth Liberation Front

The Center for Urban Horticulture was owned and occupied by the University of Washington, a state university – indeed, the state's flagship university. Education is a core governmental function. As a result, the Center for Urban Horticulture was part of state government. Professor Bradshaw's work as a faculty member similarly was part of government. This is even more clearly the case because Professor Bradshaw testified that much of his research was funded by grants from the federal Government. By targeting the Center for Urban Horticulture to attack Professor Bradshaw's work, Waters and her co-conspirators clearly intended either to influence through intimidation, or to retaliate against, government conduct. And the resulting communique not only acknowledged that Bradshaw and his research were targeted, but contained the defiant claim that even pending legislation would not stop the perpetrators of the Center for Urban Horticulture and Jefferson Poplar Farm arsons.

For all of these reasons, Waters and her co-conspirators' offense was "calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A), and the Presentence Report correctly recommends that the Court apply the enhancement.

**C.   The Presentence Report Correctly Declines to Apply a Downward Adjustment based upon Waters' Role in the Offense.**

Waters has objected to the fact that the Presentence Report does not recommend a downward adjustment based upon Waters' role in the offense. *See* PSR ¶ 28. Section 3B1.2 provides that a defendant should receive a four-level downward adjustment where the defendant was a minimal participant, or a two-level downward adjustment where a defendant was a minor participant, in criminal activity. USSG § 3B1.2. To qualify for even the latter adjustment, a defendant must be "less culpable than most other participants." *Id.* comment. (n.3).

Waters does not meet this test. Waters attended planning meetings, provided a location for Solondz to build incendiary bombs, arranged for a rental car, served as a lookout during the arson (including radioing her co-conspirators to warn them of a passing police car), and drove a getaway car to pick up her co-conspirators. Waters' role was far larger than that of Phillabaum, who merely attended planning meetings and helped carry material to the Center for Urban Horticulture. It also was larger than that of Kolar, who merely attended planning meetings and cut the glass to Professor Bradshaw's office. Thus, Waters was not "less culpable than most other participants," *id.*, and the Presentence Report correctly declines to apply a downward adjustment for Waters' role.

**D.   The Presentence Report Correctly Applies an Adjustment for Obstruction of Justice.**

The Presentence Report correctly applies a two-level upward adjustment under Section 3C1.1 of the Sentencing Guidelines for obstruction of justice. *See* PSR ¶ 29. Section 3C1.1 provides for a two-level adjustment "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." The guideline commentary expressly provides that this adjustment applies where a defendant commits perjury. USSG § 3C1.1 comment. (n.4(b)). To impose the adjustment, the Court must find that (1) Waters gave false testimony at her 2008 trial, (2) concerning a material matter, (3) with the willful intent to provide false testimony, rather than as a result of

confusion, mistake, or faulty memory. *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). All three elements are present here.

At trial, Waters repeatedly denied any involvement in the Center for Urban Horticulture arson. For example, she was asked

> Q.   You've heard testimony here from Lacey Phillabaum, from Jennifer Kolar, that you were involved in the arson that they committed at the University of Washington in May 2001. . . .
> . . . .
> Q.   Were you in any way involved in that arson?
> A.   Absolutely not.

Tr. at 2371; *see also* Tr. at 2413 (Waters denied committing any crime with William Rodgers); tr. At 2419 (Waters denied committing any crime with Jennifer Kolar).

Waters has subsequently admitted in her plea agreement that this testimony was false, *see* Plea Agreement ¶ 7, and there can be no doubt but that it was both material and willful. As a result, the PSR correctly recommends a two-level increase in Waters' offense level for obstruction of justice.

E.   **The Presentence Report Correctly Recommends a Downward Adjustment for Acceptance of Responsibility.**

Finally, the Presentence Report correctly recommends that Waters' offense level be decreased by three levels based upon Waters' acceptance of responsibility, pursuant to Section 3E1.1 of the Sentencing Guidelines. *See* PSR ¶ 35.

Based upon the calculations discussed above, the Presentence Report correctly recommends that the Court find that Waters' total offense level is 35, that her criminal history category is VI, and that her Sentencing Guidelines range is 292-365 months. *See* PSR ¶¶ 35, 60.

## IV. SENTENCING RECOMMENDATION

As agreed to in the Plea Agreement, the Government recommends that the Court sentence Waters to a term of imprisonment of 48 months (a recommendation in which the Probation Office also has joined). Although this sentence represents a drastic downward departure from Waters' Sentencing Guidelines range, the Government entered into a Plea

Agreement under which it has agreed jointly to recommend this sentence as a means to balance two competing considerations.

First, Judge Burgess sentenced Waters to only six years' imprisonment following her original conviction. The Government believes that that six-year sentence likely created a cap on Waters' sentencing exposure following a retrial. Because the Government believed it required Waters' cooperation in order successfully to prosecute Solondz (who was scheduled to be returned from China in time for Waters' retrial), the Government had to offer Waters something less than six year's imprisonment.

Second, the Government was determined to act consistently compared to the two other defendants already sentenced in connection with the Center for Urban Horticulture arson, namely Phillabaum, who was sentenced to 36 months' imprisonment, and Kolar, who was sentenced to 60 months' imprisonment. As explained below, in order to fairly punish Waters, the Government concluded that Waters' sentence necessarily had to be at least 48 months. Any lesser sentence would unfairly benefit Waters relative to Phillabaum, who deserved a materially-lesser sentence than Waters in every respect.

The Government believes that a 48-month sentence is consistent with the factors set forth in 18 U.S.C. § 3553(a):

A.  **The Nature and Circumstances of the Offense**

As an initial matter, there can be no dispute that Waters played a substantial role in a serious crime. Waters participated in a series of meetings to plan the arson. Waters allowed her then-boyfriend, Solondz, to use a garage in which she was living to build incendiary bombs for the arson. Waters tricked her cousin into renting a car that Waters and her co-conspirators used to commit the arson. And, Waters served as a lookout during the arson, including radioing to her co-conspirators to warn them of a passing police car.

There also is no dispute that the arson was a terrible crime. Based on their erroneous conclusion that Professor Bradshaw was performing genetic engineering of poplar trees, Waters and her co-conspirators burned a large university building devoted to botanical research and teaching. In doing so, they created a huge fire that easily could

have injured or killed either students (who often worked and slept in the building overnight) or responding firefighters (for whom this was the largest -- and one of the most dangerous -- fires they battled during the entire year of 2001).

Waters and her co-conspirators caused more than $6 million of damage to the University of Washington. They caused even greater professional, psychological, and other non-economic harm to the occupants of the Center for Urban Horticulture. To take but three examples:

-- C.C., a graduate student, submitted a victim impact statement that refers to "the years [her] graduation has been delayed" because of the destruction of her research and her laboratory, and that states that she has "irreversibly lost [] a basic trust of people."

-- L.C.-S., a faulty member, submitted a victim impact statement that indicates that the arson resulted in the "destruction of [her] lab research career," and that she was "effectively forced to change jobs because [she] could no longer continue to do what [she] had come to UW and CUH to do." The statement also notes that the arson "terrified [her] children, who were 6 and 11 at the time."

-- S.R., another professor, submitted a victim impact statement that indicates that she lost a year of work, and easily could have failed to get tenure, as a result of the fire. "Graduate students lost their work and had to postpone job offers and additional educational opportunities." S.R. notes that "[t]his violent act devastated us and . . . we, as individuals, will never fully recover. They took years away from us and changed how we look at our fellow human[] beings." S.R. also began having panic attacks immediately after the fire, and, ultimately, moved because of the fire because her residence was listed in the phone book.

In sum, Waters' crime had a devastating -- and fully foreseeable -- impact on an academic community, none of the members of which did anything to deserve that impact.

Moreover, unlike Phillabaum, who withdrew from the conspiracy after the Center for Urban Horticulture arson, Waters participated in another arson later in 2001, namely, the arson of the Litchfield Wild Burro & Horse Corrals. Thus, Waters' criminal conduct cannot credibly be characterized as a one-time mistake -- rather, it was repeated and egregious.

### B. Waters' History and Characteristics

Although Waters appears to be an admirable person in certain respects (as witnessed by the number of letters submitted on her behalf), the circumstances of this case raise substantial questions about Water's history and characteristics.

In a letter to the Court, Waters repeatedly seeks to excuse her conduct as that of a naive and immature person 11 years ago. Waters' characterization is not entirely fair. Her criminal conduct did not stop in 2001. Rather, it continued until 2008. Each of the other members of Rodgers' ELF/ALF cell who was arrested (except Rodgers, who committed suicide) pled guilty and either (1) agreed to cooperate or (2) agreed to a limited form of cooperation in which they gave proffers describing their own criminal conduct, but refused to identify or cooperate against others. Waters, by contrast, originally went to trial and obstructed justice by presenting a defense premised upon her own perjury.

Moreover, Waters' defense was characterized by repeated groundless accusations of Government misconduct and judicial bias. Thus, Waters repeatedly alleged that Federal Bureau of Investigation Special Agents and Assistant United States Attorneys suppressed evidence, lied, and obstructed justice. Significantly, Judge Burgess repeatedly found "no evidence of government misconduct." *See, e.g.*, Order Affirming Magistrate Judge's Detention Order, at 2 (Mar. 28, 2008). Waters's response, however, was to file a Ninth Circuit brief alleging "consistently biased rulings" by Judge Burgess.

Waters' defense also was characterized by vicious attacks on cooperating witnesses. For example, defense counsel outed one of the government's witnesses, Kolar, on the stand, and called another witness, Phillabaum, an "unprincipled slut." Waters necessarily was complicit in this defense strategy, since her uncorroborated testimony that Kolar supposedly had romantically approached Waters, and that Phillabaum supposedly had had an affair with Solondz (facts denied by both Kolar and Phillabaum), provided the only supposed basis for these attacks.

Waters' obstruction of justice culminated in her own testimony. Waters perjured herself during that testimony, both by making general claims of innocence and by denying

specific facts that were established both by the testimony of other witnesses and by corroborating documentary evidence. Waters' obstruction of justice and perjury were not only fresh crimes committed by Waters in 2007, they came at great cost to our system of justice. Waters and her counsel appeared to be playing to an audience that is extremely skeptical of government and law enforcement. By falsely claiming to be innocent, and by making what she knows to be groundless claims of misconduct, Waters fueled perceptions of injustice.

Waters also contributed to an environment in which others are likelier to commit fresh crimes of violence. One of the arsons committed by Waters' co-conspirators was the March 2001 arson of Joe Romania Chevrolet in Eugene, Oregon. That arson was committed "in support" of two other persons who had committed an ELF arson at Joe Romania Chevrolet in 2000 and who were on trial for that arson in March 2001. The government does not believe that it is a coincidence that a major ELF arson -- in fact, the largest ELF arson in the State of Washington since the Center for Urban Horticulture arson -- took place in Snohomish County, Washington, while the jury was deliberating in Waters' case. By falsely protesting her innocence, and by constantly claiming government and judicial misconduct, Waters fueled an environment in which such crimes continue to occur.

Waters' actions in engaging in two separate arsons, months apart, and her willingness to go to any lengths -- including perjury, vicious attacks on witnesses, and unfounded accusations of government misconduct -- all to avoid being held responsible for her own crimes, all raise significant questions about Waters' history and characteristics.

C.   The Sentencing Range.

As noted above, Waters' advisory sentencing range under the Sentencing Guidelines is 235-293 months. This range is based in substantial part upon the fact that Waters' crime qualifies as a "federal crime of terrorism." The Government is recommending a sentence that is far below this range, based, in part, upon the recognition that Waters' crime, while extremely serious, is qualitatively different from crimes of

terrorism that are intended to result in injury or death.  Nonetheless, Waters' high sentencing range counsels a substantial sentence.

D.     **The Need to Avoid Unwarranted Sentence Disparities among Defendants.**

As noted above, the need to avoid unwarranted sentence disparities among defendants requires a sentence no less than the 48 months that the Government is recommending.  Of the five participants in the Center for Urban Horticulture arson, Judge Burgess and this Court already have sentenced three.  (The fourth, Rodgers, committed suicide following his arrest.)

-- Solondz, the last to be arrested and the defendant who had the most significant role after Rodgers – including making the incendiary devices used to burn the Center for Urban Horticulture – received a sentence of 72 months.

-- Kolar, who participated in three arsons, and who received a benefit based upon the matters discussed in the Government's Filing Concerning Defendant's Sentencing, received a sentence of 60 months' imprisonment.

-- Phillabaum, who participated only in the arson of the Center for Urban Horticulture, and who received a benefit based upon the matters discussed in the Government's Filing Concerning Defendant's Sentencing, received a sentence of 36 months' imprisonment.

In order to avoid unwarranted disparity, Waters clearly should receive a sentence materially-longer than Phillabaum.  Unlike Phillabaum, who pled guilty promptly, Waters went to trial and presented a defense based upon elaborate perjury.  Unlike Phillabaum, who committed only one arson, Waters committed two.  And Phillabaum clearly deserved a greater benefit than Waters based upon the matters discussed in the Government's Filing Concerning Defendant's Sentencing.

Indeed, one could well argue that Waters should receive a sentence comparable to Kolar, with Waters' perjury at her initial trial balancing Kolar's participation in a third arson, and the two receiving approximately equal benefits based upon the matters discussed in the Government's Filing Concerning Defendant's Sentencing.  Given the Government's need for Waters' cooperation against Solondz, however, the Government

concluded that it had no choice but to agree to a joint recommendation of 48 months' imprisonment.

Accordingly, the Government asks that the Court impose a 48-month sentence upon Waters. The Government believes such a sentence can adequately be said to balance the various factors set forth in 18 U.S.C. § 3553(a), and that any lower sentence would fail to do so. A 48-month sentence will require Waters, who currently has served the equivalent of approximately three-years-and-one-month in prison, including good time, to return to prison for a period of some months. Based, in significant part, upon that fact, it will serve the goals of deterring others from similar crimes, and will promote respect for the law, reflecting the tremendous harm that the community has suffered as a result of Waters' crime.

## V. RECOMMENDATION REGARDING PLACEMENT

Waters has indicated through counsel that she intends to ask the Court to recommend that she be placed in a halfway house to complete her sentence. Such a recommendation would be based upon 18 U.S.C. § 3624(c)(1), which was amended in 2008 to provide that the Bureau of Prisons (BOP) "shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility." 18 U.S.C. § 3624(c)(1). Waters suggests that the Court should rely upon this provision to recommend that Waters spend the entire approximately-11-months left of her anticipated 48-month sentence in a halfway house.

This Court should not do this for two reasons. First, BOP's implementing regulations provide that halfway house placements should generally be limited to six months or less. On April 14, 2008, BOP issued a memorandum that provides that "'[w]hile the Act makes inmates eligible for a maximum of 12 months pre-release RRC [i.e, residential reentry center] placements, Bureau experience reflects inmates' pre-release RRC needs can usually be accommodated by a placement of six months or less.'"

*Sacora v. Beaman*, 628 F.2d 1059, 1063 (9th Cir. 2010) (quoting the BOP memorandum). On November 14, 2008, BOP issued a second memorandum that provides that "a RRC placement beyond six months should only occur when there are unusual or extraordinary circumstances justifying such placement, and the Regional Director concurs." *Id.* (quoting the BOP memorandum). The Ninth Circuit has upheld these memoranda and procedures as reasonable constructions of 18 U.S.C. § 3624(c). *Id.* at 1065-70.

Although the ultimate decision of whether Waters should be permitted spend the final 11 months of her sentence in a halfway house ultimately is BOP's decision, *see* 18 U.S.C. § 3621(b); *United States v. Dragna*, 746 F.2d 457, 458 (9th Cir. 1984), this Court should not recommend such a placement, because Waters falls short of the standard that BOP will apply. Waters' request is based primarily upon the impact that a return to jail will have on her daughter. Although this situation is certainly tragic, it is neither "unusual [n]or extraordinary." Unfortunately, all too many defendants, perhaps even the majority, have children who are impacted by their parents' decisions to engage in crime, and subsequent incarceration. As a result, Waters' parenthood is not a factor that BOP is likely to weigh significantly in assessing Waters' request to spend the last 11 months of her sentence in a halfway house, and this Court should defer to BOP's determination of the appropriate amount of halfway house time to allow Waters at the completion of her sentence for the serious crime of which she stands convicted.

Second, and even more important, making the recommendation that Waters seeks will undermine the parties' recommended sentence. As set forth in Part IV.A, Waters' crime was a serious crime that resulted in significant danger to firefighters and others, in more than $6 million in property damage, and in serious professional and emotional impacts on the professors and students who worked in the Center for Urban Horticulture. Moreover, it was a high-profile crime that impacted the public, separate and apart from those with direct connections to the Center for Urban Horticulture. As set forth in Part IV.B, Waters compounded her crime by presenting a defense based upon perjury, upon unfounded allegations of government misconduct, and upon outrageous attacks on those

of her former co-conspirators decided to accept responsibility, and try and to atone for their crimes as best they could.

Waters already has been the beneficiary of a plea bargain under which the parties are making a sentencing recommendation lighter than might have been the case, based upon the need for Waters' cooperation in the prosecution of Solondz. The Court should not contribute to making Waters' punishment even lighter, by recommending that Waters be granted the unusual benefit of being permitted to serve nearly the final year of her sentence in a halfway house. For the Court to do so would essentially give Waters the same sentence that Phillabaum received, something Waters clearly does not deserve. Allowing Waters to avoid returning to prison also would undermine respect for the law, and the deterrent value to others of the Court's sentence. Put otherwise, Waters' crimes and her subsequent behavior were so egregious that they demand Waters being required to return to prison to serve the normal portion of her 48-month sentence.

Finally, declining to make the recommendation that Waters seeks is consistent with the Plea Agreement into which the parties understood that they were entering. Prior to executing the Plea Agreement, the Government contacted BOP and was informed that BOP generally does not allow inmates to spend more than the last six months of a sentence in a halfway house. This understanding was incorporated into the Plea Agreement. *See* Plea Agreement ¶ 10 (providing that the Government will recommend a six-month halfway house placement, "pursuant to the provisions of the Bureau of Prisons' program allowing inmates to serve up to the final six months of a sentence in a residential reentry center"). Thus, the Government understood, and believes Waters also understood, that the parties' agreed 48-month recommendation would require her to serve some additional period of imprisonment.

For all of these reasons, the Government believes the Court should recommend that Waters be permitted to serve the last six months of her sentence in a halfway house, consistent with BOP's general policy. The Court should, however, decline Waters' invitation to recommend that Waters spend the entire remaining portion of her sentence in a halfway house, which would be contrary to BOP's general policy, the parties' Plea

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Agreement, and, most important, considerations of the factors listed in 18 U.S.C. § 3553(a).

## VI. CONCLUSION

For the foregoing reasons, the Court should sentence Waters to 48 months' imprisonment, to be followed by three years' supervised release, should waive a fine based upon Waters' inability to pay, but should order Waters to pay $6,092,649.85 in restitution and a $400.00 penalty assessment. The Court should recommend that Waters be incarcerated at FCI-Dublin, and that she be permitted to spend the final six months (but no more) of her sentence at a halfway house.

DATED this 18th day of June, 2012.

Respectfully submitted,

JENNY A. DURKAN
United States Attorney


s/ Andrew C. Friedman
ANDREW C. FRIEDMAN
Assistant United States Attorney


s/ Thomas M. Woods
THOMAS M. WOODS
Assistant United States Attorney

700 Stewart Street, Suite 5220
Seattle, WA  98101
Telephone:   (206) 553-7970
Fax:              (206) 553-0755
E-mail:         Andrew.Friedman@usdoj.gov
                     Thomas.Woods2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

s/ Andrew C. Friedman
ANDREW C. FRIEDMAN
Assistant United States Attorney

United States Attorney's Office
700 Stewart, Suite 5220
Seattle, Washington 98101-1271
Telephone:   206-553-2277
Fax:         206-553-0755
E-mail:      Andrew.Friedman@usdoj.gov